UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ROBERT TOLER, Ph.D. )<br>)<br>    Plaintiff, )<br>)<br>VS. )<br>)<br>SUNRISE SENIOR LIVING SERVICES, )<br>INC. D/B/A BRIGHTON GARDENS OF )<br>SAN ANTONIO and PRIME CARE SEVEN, )<br>LLC )<br>)<br>    Defendants. ) | Civil Action No: SA-06-CA-887-XR |

**ORDER**

Having considered the briefs, exhibits, and relevant case law, the Court DENIES Defendants' Motion for Summary Judgment (Docket No. 37).

**Factual and Procedural Background**

According to his First Amended Petition, Plaintiff Robert W. Toler, Ph.D. was a resident of Brighton Gardens, an assisted living facility, in Bexar County, Texas from 2000 through August 2004. On August 9, 2004, Defendants took action to have him involuntarily removed from Brighton Gardens and committed to a psychiatric institution.

As a result of this involuntary commitment, Plaintiff brought suit to recover damages arising from Defendants' alleged negligence. In addition to his claim for improper commitment, Plaintiff contends Defendants violated the proper duty of care owed him and were negligent in

1

failing to effectuate policies and procedures that would have prevented his unjustified commitment. Plaintiff argues that as a direct and proximate cause of Defendants' negligence, he suffered physical injuries, mental anguish, and loss of reputation, in addition to incurring expenses for medical care and attention, physicians' fees, court costs, attorneys' fees, and the costs of changing his residence.

Defendants deny Plaintiff's claims and filed a Motion for Summary Judgment on September 11, 2007.

**Legal Analysis**

Summary Judgment Review

The Federal Rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[2] Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth

---

[1] FED. R. CIV. P. 56(c).

[2] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

specific facts to show the existence of a genuine issue for trial.[3] All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes."[4] Worded differently, "a court is to make all reasonable inferences in favor of the nonmovant in ruling on a summary judgment motion."[5]

Factors to Consider in Summary Judgment Motion on Medical Malpractice Claims

This is a diversity case in which Texas medical malpractice law applies. According to the law, a defendant is "entitled to summary judgment if the summary judgment proof negates one or more of the following elements of the plaintiffs' cause of action: 1) the duty to act according to a certain standard of care; 2) a breach of that standard of care; 3) an injury; or 4) a causal connection between the breach and the injury."[6]

The courts have found that "expert testimony is required on the issues of medical negligence and causation."[7] Furthermore, "if a defendant-movant in a medical malpractice action negates an element of a plaintiff's cause of action by competent summary judgment evidence, such as expert testimony, the non-movant plaintiff is required to present controverting expert

---

[3] *See Id.* at 322-3; Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-6 (1986).

[4] Williams v. Time Warner Operation, Inc., 98 F.3d 179, 181 (5th Cir. 1996).

[5] Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th Cir. 2005).

[6] Spinks v. Brown, 103 S.W.3d 452, 456 (Tex. App. 2002).

[7] Suniga v. Eyre, 2004 WL 86139, 2 (Tex. App. 2004).

testimony in order to raise a fact issue."[8]

Duty to Act According to a Certain Standard of Care

With the relevant legal factors set forth above, the focus shifts to the application of the facts of this case to those factors to determine whether Plaintiff's claims survive summary judgment. If Defendants succeed in negating, as a matter of law, any element which Plaintiff bears the responsibility of proving at trial, summary judgment is proper.

First, Plaintiff must establish Defendants possessed a duty to act according to a specified standard of care. The parties both concede that Plaintiff was a resident at Brighton Gardens, an assisted living facility. What they dispute is whether Plaintiff has articulated a standard of care that applies in this case.

To this end, Plaintiff presents exhibits containing the expert opinions of Dr. Leatherman and Dr. Goethe. In her deposition transcript, Dr. Leatherman provides a thorough summary of her understanding of the standards of care regarding documentation in an assisted living facility.[9] In her report, Dr. Goethe articulates the standards "applicable to assisted living facilities, including Brighton Gardens Assisted Living, in and around Bexar County, Texas."[10] Defendants, in turn, have provided no evidence nor made any arguments showing that the standards of care articulated by Drs. Leatherman and Goethe incorrectly state the duty they owed to Plaintiff.

---

[8] *Spinks*, 103 S.W.3d at 456.

[9] Plaintiff's Exhibit G at 42-4.

[10] Plaintiff's Exhibit H at 5.

Breach of Standard of Care

Having established that Defendants owed a certain standard of care to Plaintiff, the question becomes whether they breached that duty. Defendants argue that Plaintiff has failed to produce evidence as to how they violated the duty of care owed to him.

In his First Amended Complaint, Plaintiff asserts that Defendants were negligent in wrongfully and involuntarily committing him to a psychiatric unit. Plaintiff further argues that Defendants failed to implement and/or follow polices and procedures that would have prevented his unnecessary commitment. Together, Plaintiff contends, these failures by Defendants violated the standard of care owed to him as a resident of Brighton Gardens.

In support of his assertions, Plaintiff relies on the deposition testimony of Dr. Leatherman and the expert reports of Drs. Leatherman and Goethe. Both doctors, after reviewing Defendants' medical files on Plaintiff, concluded that the evidence in this case establishes that Defendants improperly violated the appropriate standards of care owed to Plaintiff. In their respective reports, both doctors listed each purportedly violated standard of care, followed by the specific facts that led them to conclude Defendants had not acted in accordance with the standard. For example, Dr. Leatherman refers to the *Texas Department of Aging and Disability Services Licensing Standards for Assisted Living Facilities Handbook* to assert that Defendants possessed a duty to update a resident's service plan upon a significant change in condition, and that such service plan should have been approved and signed by the resident or a person responsible for the resident's health care decisions. In alleged deviation four of that standard, Dr. Leatherman observes that "Brighton Gardens deviated from the standard in failing to provide an updated service plan in response to Dr. Toler's newly diagnosed physical problem and significant change

in condition [referring to the diagnosis of pleural effusion and prescription of hydrochlorothiazide for the condition]. There is no evidence of documentation of a new diagnosis in his service plan, and there is no evidence of change in care based on a new health care need."[11]

Dr. Goethe, a neuropsychologist, states, for example, in her report that Brighton Gardens did not meet the applicable standards of care when "on June 30, 2004, and without physician input or asking Dr. Toler about his history, the diagnosis of Paranoid Schizophrenia was added to Dr. Toler's list of medical conditions."[12] Purportedly, the only source for this diagnosis was Plaintiff's daughter, who reported that she had been told at some point that approximately thirty years before, her father had been diagnosed with this disorder.[13] In Dr. Goethe's opinion, Defendants' negligence in diagnosing Plaintiff with a serious psychotic disorder without at least an examination by a physician contributed to later mis-diagnoses by Defendants as to Plaintiff's medical needs, leading to the Plaintiff being wrongfully committed in a psychiatric institution.

Both Dr. Leatherman and Dr. Goethe, after reviewing the evidence before them, opined that Defendants repeatedly breached their standards of care to Plaintiff. Interpreted in the light most favorable to Plaintiff, the findings of these two expert witnesses raise genuine issues of material fact as to the purported failure of Defendants to properly care for Plaintiff.

---

[11] Plaintiff's Exhibit F at 8,12.

[12] Plaintiff's Exhibit H at 19.

[13] *Id*.

Injury

In disputing whether Plaintiff has met the summary judgment requirements for evidencing an actual injury, Defendants simply state that "Plaintiff has failed to provide any admissible evidence of these injuries."[14]

Admittedly, Plaintiff's evidence of injuries is scarce. Because Defendants did not specifically challenge the lack of evidence for specific forms of injury, such as mental anguish, the Court will look to see only whether there is evidence that some injury resulted from Defendants' actions. In her deposition, Dr. Leatherman states that she saw "bruises and abrasions around [Plaintiff's] wrists where the handcuffs were."[15] Such testimony provides evidence of an injury, and this evidence is sufficient for surviving summary judgment. Plaintiff would be well advised, however, to marshal more evidence of his various alleged injuries before trial commences.

Causal Connection between Breach and Injury

The final step is to determine whether Plaintiff has established that the Defendants alleged breach of care proximately caused the injury complained of. "In a medical malpractice case, proximate cause must be established by expert testimony based on a reasonable medical probability."[16] According to the Texas Supreme Court, a reasonable medical probability means that "it is more likely than not that the ultimate harm or condition resulted from such

---

[14] Defendants' Motion for Summary Judgment at 4.

[15] Plaintiff's Exhibit G at 133.

[16] Columbia Medical Center Subsidiary, L.P. v. Meier, 198 S.W.3d 408, 414 (Tex App. 2006).

negligence."[17]

Defendants argue they could not have caused Plaintiff to have been committed to a psychiatric institution because they lacked the authority to issue such an order. Furthermore, they argue that the affidavits by Dr. Smith, Dr. Harrison, and Plaintiff's daughter attesting to Plaintiff's incapacity destroy the causal connection between the alleged negligent acts and themselves.

While Plaintiff acknowledges Defendants needed a doctor's order, he argues that absent their negligent actions in failing to provide the appropriate standard of medical care, there would have been no basis for his commitment. Furthermore, he alleges that the Defendants failure to properly document his medical condition and appropriately amend or seek amendment of his service plan prevented other parties involved in the commitment process from possessing the information they needed to make informed decisions about his medical needs, especially with respect to whether commitment in a psychiatric institution was necessary.

The causation issue in this case is challenging. Drs. Goethe and Leatherman independently conclude, upon their review of the evidence, that Plaintiff should not have been committed, and more to the point, that his commitment resulted from the breaches of care in the treatment he received from Defendants. While compelling evidence in Plaintiff's favor, it is not dispositive. Rather, these experts' conclusions must be considered within the framework of the probable cause inquiry, which is whether, when construing the facts in the light most favorable to Plaintiff, "it is more likely than not that the ultimate harm or condition resulted from

---

[17] Kramer v. Lewisville Memorial Hospital, 858 S.W.2d 397, 400 (Tex. 1993).

[Defendants' alleged] negligence."[18]

It is a close call whether Plaintiff has met this burden. Plaintiff has presented evidence, which if true, strongly suggests Defendants failed to properly investigate and respond to his medical needs. The parties do not seem to dispute that in the month leading up to Plaintiff's commitment, he expressed indicia of developing violent tendencies and mental instability. What Plaintiff disputes is the cause behind these developments. As Dr. Leatherman's report concludes, the breakdown in care provided by Defendants purportedly set in motion a series of events leading to Plaintiff's outbursts. In Dr. Leatherman's words, Plaintiff's "anger and irritability, which could have been due to poorly controlled diabetes or cardiac problems, were automatically attributed to his schizophrenia. The staff patronized him. All of these factors served to increase Dr. Toler's fear and sense of alienation and because he had limited ways in which he could impact his environment (physical impairment, limited mobility, dependence on others for transportation), he often acted out aggressively."[19]

Defendants seem to view these signs as connected to a diagnosis of paranoid schizophrenia. There does not appear to be, however, any identifiable medical findings that Plaintiff suffered from such a disorder. The sole basis for its inclusion in Plaintiff's medical file seems to be a remark made by Plaintiff's daughter that she thought Plaintiff may have been diagnosed with paranoid schizophrenia some thirty years before. Dr. Leatherman, a geriatric psychiatrist, wrote in her report, however, that "when I examined Dr. Toler in October 2004 and November 2004, I saw no evidence of delusions, hallucinations, or other symptoms of

---

[18] *Id.* at 400.

[19] Plaintiff's Exhibit F at 13-4.

schizophrenia."[20] Plaintiff's experts contend Defendants' conclusions about the causes of his abnormal behavior and the threat it presented to others may have been based on inaccurate assumptions derived from their negligence in diagnosing him without following correct standard of care protocols. Thus, Plaintiff, largely through his two expert witnesses, has presented enough evidence to raise a genuine issue of fact as to whether Defendants properly diagnosed his medical condition during the summer of 2004, adequately involved him and his daughter in shaping a care plan as required by the relevant standards of care, and took reasonable steps to avoid the escalation of his situation to the point where they, in the opinion of Drs. Leatherman and Goethe, improperly moved for his involuntarily commitment.

In response to the opinions of Drs. Leatherman and Goethe, Defendants assert that between July 30, 2004 and October 7, 2004, four physicians attested that Plaintiff was without capacity. To this argument, Plaintiff points out that Dr. Smith never requested an order for protective custody and that Defendants possess no records evidencing that Dr. Harrison, whose certification of medical examination for mental illness was used by Defendants in their Motion for Order of Protective Custody, ever personally examined Plaintiff. As for Drs. Valdez and Bass, they did not evaluate Plaintiff until after he had been committed to a psychiatric hospital against his will. As Dr. Leatherman observed, such a traumatic process as involuntary commitment can significantly affect someone in Plaintiff's position, which in turn could substantially affect any evaluations done shortly thereafter. Furthermore, the patient records these post-commitment doctors relied on in reaching their conclusions certainly included those provided by Defendants, as evidenced by Dr. Valdez's assertion that Plaintiff had a history of a

---

[20] *Id*. at 14.

mental illness, apparently referring to schizophrenia, dating back to 1972. As already noted, the only source for such an assertion would appear to be Defendants' records, which on this issue, seem to be based solely on the uncertain remarks of Plaintiff's daughter, a person admittedly not qualified to make medical diagnoses.

Finally, as for the affidavit of Plaintiff's daughter, Ms. Twyla Benson, she testified in her deposition that Mr. Steve McAndrew, the Executive Director for Brighton Gardens, made clear to her that if a psychiatric evaluation was not arranged for her father, he would be evicted. According to Ms. Benson, Mr. McAndrew provided her with the Application for Temporary Commitment for Mental Illness and instructed her in person as to what to write down. Allegedly faced with such pressure, and trying to do what she thought would help solve the growing problems between Defendants and her father, Ms. Benson testified she went so far as to state, at Mr. McAndrew's direction, that she believed her father was likely to cause harm to himself, even though she did not believe that to be true.

In sum, Plaintiff has presented evidence, including through expert witnesses, challenging the accuracy and thoroughness of Defendants' conclusions about his medical needs. If the evidence and expert opinions presented by Plaintiff are true, then it is likely that the clear and convincing evidence standard required for involuntary commitments would not have been met. Plaintiff, through the reports of his expert witnesses and other summary judgment exhibits, has presented evidence that, when construed in the light most favorable to Plaintiff, creates a genuine issue as to whether Defendants' negligence brought about Plaintiff's involuntary commitment, and the injuries suffered therefrom. Therefore, the Court finds Plaintiff has successfully met the proximate cause requirements needed to survive a motion for summary judgment.

**Conclusion**

When viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has successfully met the summary judgment requirements for the four necessary elements of a medical malpractice claim in Texas. Accordingly, Defendants' Motion for Summary Judgment (Docket No. 37) is DENIED.

It is so ORDERED.

SIGNED this 26th day of October, 2007.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE